GUARDIANSHIP OF ESSIY FINK, [1] GEORGE FINK, FIDUCIARY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Guardianship of Fink v. Commissioner
Docket Nos. 3262-79, 8003-79.
United States Tax Court
T.C. Memo 1984-505; 1984 Tax Ct. Memo LEXIS 170; 48 T.C.M. (CCH) 1187; T.C.M. (RIA) 84505; September 20, 1984. Robert B. Pierce and Mark C. Pierce, for the petitioner. Beth L. Williams, for the respondent. PARKER MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in Essiy Fink's Federal income tax and additions to the tax for the 1970, 1973, and 1974 taxable years as follows: Addition to Tax
Year
Deficiency
Section 6653(a) [2]
1970
$120,818.40
$6,040.92
1973
378,983.35
18,949.17
1974
92,222.10
4,611.10
*174 Petitioner claims overpayments of tax for the full amounts reported on the tax returns for the years 1970, 1973, and 1974, in the amounts of $21,592.00, $56,019.21, and $57,975.44, respectively. The issues for decision are (1) whether the income of the E. Fink Company, an unincorporated ovenware business, [3] is taxable to Essiy Fink; (2) if not, whether overpayments of Federal income taxes have occurred and the amounts of such overpayments; (3) if so, whether this Court has jurisdiction to determine Essiy Fink's entitlement to receive any such overpayments; and (4) whether Essiy Fink is liable for additions to tax under section 6653(a) for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached *175 thereto are incorporated herein by this reference. Essiy Fink (hereinafter Essiy) resided in Royal Oak, Michigan, when he filed his original petitions herein. [4]Essiy resided in Farmington Hills, Michigan, when he filed his motion for leave to amend the petition and amended petition herein. Essiy was born in either 1889 or 1890, and was approximately 80 years old in 1969. He could barely read or write. He had worked for the Chrysler Corporation as an assembly line spray painter for 27 years, retiring in mid-1959. After his retirement in 1959, Essiy passed time at a retail produce business operated by Martin Bruseloff (hereinafter Martin), his son-in-law. Essiy occasionally performed some odd jobs for Martin for which Martin occasionally gave him a few dollars. Paul Bruseloff *176 (hereinafter Paul) is Martin's brother. At some point in 1968, Paul and Martin formed a "partnership," [5] the business of which involved the purchase and sale of ovenware. The business purchased its ovenware from the Jeanette Glass Company (hereinafter Jeanette) in Pennsylvania, then sold it to distributors, who retailed the product to the ultimate consumer. Essiy was not involved in the ovenware business in any manner in 1968. *177 At some point in 1968 or 1969, Paul and Martin purportedly terminated their partnership, and Paul purportedly continued the ovenware business as a sole proprietorship. See footnote 5. Although no longer a "partner," Martin remained active in the business, being responsible for maintaining the records of the ovenware business, and also advising Paul on the daily operations of the business. Paul had left school after the fourth grade, and could barely read or write. Essiy first became "involved" with the ovenware business in the latter part of 1969. Various legal problems had arisen that made if difficult for Paul to continue operating the ovenware business in his own name. The nature of these legal problems is not entirely clear, but Paul was engaged in various unfair trade practices, involving distribution of an ovenware product that looked like Corningware. This led the United States District Court for the Eastern District of Michigan, Southern Division, to issue a temporary restraining order and a preliminary injunction against Paul Bruseloff and others on October 16, 1969 and November 2, 1969, respectively. Apparently a permanent injunction was also issued. In any event, *178 Paul asked Martin if he knew anyone who would lend the use of his name to the business, and Martin suggested his father-in-law, Essiy. Essiy, being very fond of his son-in-law, agreed to let the ovenware business be operated in his name, understanding that this enabled the Bruseloffs to continue to make a "nice living" in that activity. Also Martin told Essiy that he would take care of any taxes from the ovenware business. During the years 1969 through 1976, the ovenware business was operated under the name of the E. Fink Company, among others. Certificates of assumed name filed in Wayne County, Michigan, listed the following as assumed names: Queen Victoria, Lady Cornella, Lady Odella Co., and Countess Regalla. Although such certificates were filed in Essiy's name, they were in actuality alternative names under which the ovenware business was operated by Paul and Martin. In addition to the aforementioned names, other alternative names were also used, and ovenware was sold under seven or eight different names. There was no bank account in the name of E. Fink Company, but there was an account in the name of Queen Victoria. Aside from allowing the ovenware business *179 to be operated under his name, Essiy's association with such business was minimal. [6] During 1970 he made several trips to the Jeanette plant, acting as a courier, delivering checks and cash received from Paul's ovenware customers to Jeanette as payment for the ovenware manufactured by Jeanette. This practice was soon discontinued due to Essiy's advanced age, and his fear of losing the checks and money. Paul and Martin then used wire transfers as a form of payment, rather than using Essiy as a courier. During the years in issue, Essiy also allowed purchase orders and payments for ovenware to be mailed to his personal residence. Upon receipt, he gave all such mail to Paul or Martin. Essiy's personal residence was a two-bedroom apartment which he shared with an elderly housekeeper who paid part of the rent. The apartment was strictly for residential purposes, any commercial activity being forbidden by the terms of the lease. Other than receipt of the mail orders and payments as indicated above, none of the ovenware business activities were carried on in Essiy's apartment and no inventory or business records were located there. *180 Along with Martin, Essiy also had signatory authority over some bank accounts maintained for use in the ovenware business, and signed checks from time to time when requested to do so. However, Martin also had a power of attorney to sign Essiy's name and did so. Whatever acts Essiy performed in regard to the ovenware business were done as favors to Martin and Paul and in furtherance of the facade that he was the owner of the E. Fink Company and that it was the E. Fink Company that was carrying on the ovenware business. At no time did Essiy have any prescribed duties with respect to the ovenware business nor did he ever receive a salary or any other financial benefit therefrom. Martin may have given him some gifts of money from time to time from 1969 through 1976, but any such gifts were unrelated to the ovenware business. Essiy always lived modestly and never owned an automobile. [7]
*181 Other than the above minimal activities, Essiy took no part in the management or operation of the ovenware business. He had nothing to do with choosing Jeanette as the manufacturer of the ovenware, placing the orders for or arranging the shipping of the ovenware from Jeanette to the customer, or setting the price at which the merchandise was sold. Paul or Martin made all of these decisions. In all material respects, the ovenware business was conducted in the same manner after Essiy became "involved" as it had been before. The only change was to operate the business under Essiy's name and to report part of the income of the ovenware business on Essiy's tax returns rather than on the returns of Paul or Martin. For taxable years 1970, 1973, and 1974, Schedules C (Profit (or Loss) From Business or Profession) covering the E. Fink Company were filed as part of Essiy's Federal income tax returns (Forms 1040) for such years. [8] For taxable year 1973, a Schedule C covering the Prince Devonshire Company, engaged in the business of manufacturing and importing cutlery, was also filed as part of Essiy's tax return (Form 1040) for such year.Prince Devonshire was just another *182 name under which Paul and Martin engaged in business. Gross receipts of $2,751,537, $5,259,020.34, and $4,230,611.99 and net profits of $136,343, $122,755.03, and $333,898.49 were reported on the Schedule C's covering the ovenware business filed with Essiy's 1970, 1973, and 1974 tax returns, respectively. A not loss in the amount of ($5,716) was reported on the Schedule C covering Prince Devonshire and filed with his 1973 tax return. The only other items of income reported on Essiy's income tax returns for the years in issue consisted of pension payments from the Chrysler Corporation in the amount of $1,617.48 for 1973 and 1974 respectively, and interest income in the amount of $500, $1,000, and $1,200 and 1970, 1973, and 1974, respectively. [9] Other than occasional gifts of money from *183 Martin, Essiy had no other source of funds except his nontaxable Social Security payments of about $300 or $400 a month. Preparation and filing of Essiy's tax returns for all the years at issue herein followed the procedure described below. Mr. Phillip Nusholtz, a tax attorney who represented Paul, Martin, and Essiy during the years at issue, [10] retained a Certified Public Accountant (hereinafter CPA) to prepare the information to be submitted on the Schedule C filed with Essiy's tax return. [11] Martin, who maintained the business records for the ovenware business, *184 supplied the CPA with information pertaining to the business. The CPA then prepared a pencil copy of the Schedule C and gave this pencil copy and his work papers used in preparation thereof to Mr. Nusholtz. Mr. Nusholtz reviewed the proposed Schedule C and related work papers and either returned them to the CPA to be put in final form or prepared the final tax return himself from such information. The returns for 1970 and 1973 list Mr. Nusholtz as the return preparer; the return for 1974 lists Neal F. Zalenko, the CPA, as the return preparer. When the returns were ready for Essiy's signature, Mr. Nusholtz called Martin, who picked them up at Mr. Nusholtz's office [12] and delivered them to Essiy, who signed the returns in Martin's presence. Martin then returned the executed returns to Mr. Nusholtz, who mailed them to the Internal Revenue Service (hereinafter Service) with the remittances. *185 Mr. Nusholtz never discussed the information contained in the returns with Essiy, nor did the CPA's who prepared the Schedules C. Essiy did not read the returns before signing them. Martin may have told him in general terms about the contents of the returns. Any knowledge Essiy had of the information contained in the returns was extremely minimal. He signed the returns simply because that is what Martin wanted him to do, and because Martin had assured him that he would take care of any tax resulting from the ovenware business. The tax liabilities shown on Essiy's tax returns for the years in issue were all paid with monies received in the operation of the ovenware business. It was a customary practice of Paul and Martin to use cash receipts and customer checks to pay operating expenses of the ovenware business, rather than maintaining a bank account into which to deposit such receipts and draw checks therefrom subsequently. Some of these customer checks were payable to E. Fink Company or E. Fink. However, the record is clear that such checks were not directed to nor intended for Essiy personally, but were instead intended to be paid to the proprietor(s) of the ovenware business. *186 As to the tax liability shown on the 1970 return, Martin took cash and checksreceived from customers of the ovenware business, deposited them in a bank account the ovenware business maintained under the name "Queen Victoria," and drew a check on this account for the balance due shown on Essiy's 1970 tax return in the amount of $21,592. Martin filled out the check but had Essiy sign it. As to the 1973 and 1974 returns, Martin delivered cash and endorsed customer checks received in the course of the ovenware business over to Mr. Nusholtz, who in turn deposited these amounts in a trust account maintained for his clients and then drew a check on this account in payment of the balance due shown on Essiy's returns for such years.Mr. Nusholtz similarly received such funds from Martin and used his client trust account to write checks for any estimated taxes, payments accompanying applications for extensions to file returns, and payments of any interest or additions to tax for the tax returns filed in the name of Essiy Fink. The filing dates of the returns filed in the name of Essiy Fink for 1970, 1973, and 1974 were as follows: Date Received by
Year
Service Center
1970
8-18-71
1973
9-19-74
1974
9-15-75 [13]
*187 Forms872, "Consent Fixing Period of Limitation Upon Assessment of Income Tax," were subsequently executed with respect to each of the taxable years in issue. These Forms 872 were executed on Essiy's behalf by Mr. Nusholtz who had a very broad power of attorney from Essiy covering all tax years from 1955 through 1976. The following table summarizes the date the consents were executed and the expiration date thereof for each year: Date Consent Executed on
Behalf of District Director
Year
of Internal Revenue
Expiration Date
1970
08-05-74
12-31-75
10-17-75
04-15-77
12-20-76
12-31-77
12-05-77
12-31-78
1973
03-04-77
12-31-77
08-25-77
12-31-78
09-05-78
12-31-79
1974
08-25-77
12-31-78
09-05-78
12-31-79
*188 The following chart summarizes the dates, amounts, and nature of payments made with respect to the tax liabilities shown on the returns filed in the name of Essiy Fink: Year: 1970
Tax Shown on Return: $21,592.00 Date Payment
Description
Made
Amount
of Payment
08-18-71
$21,592.00
Remittance with return
09-17-71
431.84
Interest
Year: 1973
Tax Shown on Return: $56,019.21 Date Payment
Description
Made
Amount
of Payment
04-15-74
$25,000.00
Payment with application
for extension of time to
file return
09-19-74
16,934.11
Payment with return
11-08-74
846.70
Failure to pay addition
of $423.35 and interest
of $423.35
The balance of $14,085.10 credited to the account of Essiy Fink for 1973 was an optional credit from 1972 applied to 1973. Year: 1974
Tax Shown on Return: $57,975.44 Date Payment
Description
Made
Amount
of Payment
09-16-74
$9,500.00
Estimated tax payment
01-15-75
9,500.00
Estimated tax payment
09-15-75
38,975.44
Payment with return
11-17-75
3,478.86
Payment of estimated tax
addition, failure to pay
tax addition and interest
*189 All of the above payments of tax, additions and interest, were made from proceeds of the ovenware business and not from any funds belonging to Essiy. Forms 843, Claims for Refund, were filed with the Service on behalf of Essiy on October 24, 1975 for the three years before the Court. Similar claims for refund were filed on that date or at a later date for all years for both Essiy and Paul. See footnote 10. Each claim for refund filed on Essiy's behalf contained the following statement: This Claim is filed to protect the taxpayer's rights in the event in inconsistent position is taken under Sections 1311 through 1314 of the Internal Revenue Code in regards to the taxes of Paul Bruseloff. By separate notices of deficiency dated December 22, 1978 and June 4, 1979, respectively, respondent determined deficiencies in Essiy's income tax in the amounts of $120,818.40, $378,983.35, and $92,222.10, for the years 1970, 1973, and 1974, respectively. The deficiencies asserted against him were all based upon various adjustments to the Schedules C pertaining to the ovenware business that were filed with his income tax returns for those years. *190 By separate statutory notices dated December 22, 1978 and June 4, 1979, respectively, respondent also determined deficiencies in Paul Bruseloff's income tax and additions to the tax for fraud for the taxable years 1970, 1973, and 1974. [14] The deficiencies asserted against Paul were based, inter alia, upon respondent's determination that the income of the ovenware business was taxable to Paul, not to Essiy. While respondent in effect taxed the same net ovenware income to both Paul and Essiy for the three years before the Court, the asserted deficiencies were not exactly the same for both individuals. Essiy had little taxable income apart from the income of the ovenware business; Paul was in a higher tax bracket and had already reported substantial amounts of income from the ovenware business as commissions. ULTIMATE FINDINGS OF FACT 1. No part of the net income from the ovenware business was taxable to Essiy Fink. 2.Essiy Fink received no compensation or other taxable income from the ovenware business. 3. The taxes, additions, and interest paid in connection with the returns filed *191 in the name of Essiy Fink were paid out of proceeds of the ovenware business and were not paid out of any funds belonging to Essiy Fink. 4. There are overpayments of tax for the years 1970, 1973, and 1974 in the Internal Revenue Service's account in the name of Essiy Fink. 5. The total amount of the overpayment for each year was paid within the time periods designated in section 6512(b)(2)(C)(i). 6. There being no deficiencies in Essiy Fink's Federal income tax for the years 1970, 1973, and 1974, there is no underpayment of tax for purposes of the negligence addition under section 6653(a) in any year. OPINION To protect the fisc, respondent took inconsistent positions with respect to the income of the unincorporated ovenware business, originally asserting by separate notices of deficiency that such income was taxable both to Essiy Fink and Paul Bruseloff. Paul and Essiy were originally represented before this Court by the same tax attorney, and the cases were consolidated for purposes of trial, briefing, and opinion. Thereafter, Essiy became legally incapacitated and his son was appointed as his guardian.The guardian retained new counsel to represent Essiy *192 and to assert overpayments of tax by Essiy. The cases involving Paul were then settled, those cases were severed from the consolidated group, and stipulated decisions were entered in those cases for substantial deficiencies and fraud additions for the years 1969-1974. Only the cases involving Essiy for the years 1970, 1973, and 1974 were tried. On the surface this case appears to involve the question of whether the income of the ovenware business is taxable to Essiy, but both parties now seem to agree that Essiy did not own or operate the business and is not taxable on its income. The record clearly establishes that the ovenware business was owned and operated by either Paul alone or by Paul and his brother, Martin Bruseloff. Paul had been enjoined by the local Federal Court from carrying on the ovenware business and asked Martin for the name of someone in whose name the business could be operated. Martin suggested his father-in-law, Essiy. As a favor to Martin, Essiy agreed to let the business be operated in his name, but the record clearly establishes that Essiy had no real interest in and received no compensation or other taxable income from that business.The *193 ovenware business continued to be operated by Paul and Martin in essentially the same way it had always been carried on, except for the use of Essiy's name and the fact that part of the income of the business was reported on Essiy's returns rather than on the returns of Paul and/or Martin. However, apart from the income issue, both parties dispute the matter of who paid the taxes shown on the returns filed in Essiy's name. While petitioner carefully eschews the ovenware business income (and presumably any other unreported income from which such tax payments could have been made by Essiy), petitioner argues as a factual and legal matter that Essiy made the overpayments of tax for the years before the Court. As a factual matter, the record clearly establishes that these taxes were paid with funds from the ovenware business and not with any funds belonging to Essiy. Respondent, to counter petitioner's contention that Essiy overpaid some taxes, argues for offsets against the overpayments for any income (and tax liability) attributable to Essiy in regard to the funds used to pay the taxes. Hence, respondent, as petitioner laments, will not concede that there are no deficiencies in *194 Essiy's taxes for the years before the Court. The real dispute in this case is who gets the money paid with the tax returns filed in the name of Essiy Fink.Since the ovenware business was owned and operated by Martin and/or Paul Bruseloff and the funds used to pay those taxes came strictly from the ovenware business, it would seem that one or both of the Bruseloff brothers would be entitled to any refund of such taxes. See Bailey v. United States,104 F. Supp. 997 (Ct. Cl. 1952), for a case strikingly similar on its facts to the present one. However, neither Paul nor Martin is before the Court. Only Essiy is before the Court. The record clearly shows that he did not, as a factual matter, pay the taxes, but the legal implications of that fact will be discussed later. At trial and on brief, respondent has now conceded that the income from the ovenware business is not taxable to Essiy as he was not the owner thereof. Indeed, in view of the facts before us, any contention to the contrary would be wholly untenable. The deficiency determined for each of the years at issue arose solely out of adjustments to the Schedules C pertaining to the ovenware *195 business, which we have determined Essiy was not the owner of and therefore not taxable on its income. Respondent does not suggest that there are any other sources of unreported taxable income to sustain the deficiency determinations. See footnotes 7 and 9.It is clear that there are no deficiencies owing by Essiy in regard to the ovenware income for any of the years at issue herein. Having concededthat the income of the ovenware business is not taxable to Essiy, respondent does not now deny that there are overpayments in the Internal Revenue Service's account in the name of Essiy Fink. However, respondent does contest the amount of the overpayment for each of the years at issue. While not clearly stating the theories in support of his claim, respondent contends that the amounts used to pay the tax shown on Essiy's returns represent gross income to him. Respondent bears the burden of proof on this issue since it was first raised at trial. Rule 142(a), Tax Court Rules of Practice and Procedure. The evidence herein does not support respondent's position. Section 61 provides, *196 in part, that ". . . gross income means all income from whatever source derived . . . ." In the landmark decision of Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955), the Supreme Court defined income as ". . . undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Such is not the case here. At no time did Essiy have dominion and control over any of the funds used to pay the tax shown on his returns. At best he could be considered a mere agent in receiving such funds. Any funds which he received through the mail addressed to his personal residence were promptly turned over to Paul or Martin. Indeed, any cash or checks mailed to his personal residence were enclosed in envelopes, and it is highly unlikely that Essiy even knew the contents of such envelopes. Nor does the fact that some of the checks were payable to E. Fink or E. Fink Company require a different result. The record is devoid of any evidence that Essiy ever used any such funds for personal benefits. Instead, the record is clear that he turned all of those checks over to Martin or Paul. The use of the ovenware business's funds *197 to pay the taxes shown on Essiy's returns simply did not constitute income to him within the meaning of Commissioner v. Glenshaw Glass Co.,supra.
Nor does the payment of such tax constitute income from discharge of indebtedness. See sec. 61(a)(12); United States v. Kirby Lumber Co.,284 U.S. 1 (1931). Since Essiy was never taxable on the income of the ovenware business, there was never a valid debt to discharge that could give rise to income. We surmise that respondent's rather attenuated arguments in regard to the tax payments as taxable income to Essiy arose out of an excess of caution to try to anticipate and answer every possible result the Court might reach on petitioner's arguments. Petitioner tried, without success, to establish that Essiy actually used some of his own funds to make the tax payments or that Essiy possessed some type of interest in the funds used for those purposes. If we had found that any of the funds belonged to Essiy, we would also have found that such funds were income to him. However, even though Essiy is not taxable on the income of the ovenware business, nor on the ovenware funds used to pay the tax shown *198 on his returns, his returns do reveal some small amounts of income for the years before us that possibly result in minor amounts of tax liability in 1973 and 1974 and possibly reduce the amount of overpayments herein. Specifically, we note that Essiy received interest income and pension payments totalling over $2,000 in each of the years 1973 and 1974. However, Essiy claimed and was entitled to two personal exemptions under section 151 for each year, and was also entitled to claim the standard deduction under section 141 [15] for each year, [16] both of which will serve to reduce the amount of his taxable income to practically nothing. Respondent having failed to allege any source of income other than those reported on Essiy's returns, or to contest such returns except as to the Schedule C's concerning the ovenware business, we deem respondent to have conceded the correctness of such returns as to all matters not related to the Schedule C's. With the foregoing to guide them, we leave the computation of the exact amount of Essiy's tax liability and the overpayment for each year to the parties under Rule 155, Tax Court Rules of Practice and Procedure. See sec. 6512(a)(2). *199 We point out, however, that since we have found as an ultimate fact herein that all payments of tax in the Service's account in the name of Essiy Fink were made within the time periods designated by section 6512(b)(2)(C)(i), the overpayments computed by the parties may properly be the subject of a later refund suit by the proper party or parties. Section 6512(a)(1) expressly permits such suits as to "overpayments determined by a decision of the Tax Court which has become final." [17]Morse v. United States,494 F. 2d 876, 879 (9th Cir. 1974). *200 Having concluded that Essiy is not taxable on the income of the ovenware business for the years at issue, and also having found overpayments for each of those years, we must now address the issue that has really become the central dispute herein: whether this Court has jurisdiction to issue an "order of overpayment" in Essiy's favor. Simply stated, petitioner asserts that we do possess such power, while respondent asserts we do not. We agree with respondent. The Tax Court is a court of limited jurisdiction, and its jurisdiction exists only to the extent specifically enumerated by statute. Commissioner v. Gooch Milling & Elevator Co.,320 U.S. 418 (1943); Morse v. United States,supra,494 F. 2d at 879; Hollie v. Commissioner,73 T.C. 1198, 1204-1205 (1980). In this particular area, our jurisdiction is prescribed by section 6512(b)(1), which provides, in pertinent part, that: . . . if the Tax Court finds that there is no deficiency and further finds that the taxpayer has made an overpayment of income tax for the same *201 taxable year . . . in respect of which the Secretary . . . determined the deficiency, or finds that there is a deficiency but that the taxpayer has made an overpayment of such tax, the Tax Court shall have jurisdiction to determine the amount of such overpayment, and such amount shall, when the decision of the Tax Court has become final, be credited or refunded to the taxpayer. There may be a dichotomy between respondent's administrative duty to make tax refunds and this Court's duty in regard to overpayments of taxes. Respondent has a duty under section 6402(a) to refund an overpayment of tax to "the person who made the overpayment" [18] even though some other person may have a superior claim to the money once it is refunded. First Nat. Bank of Fort Worth v. United States,633 F. 2d 1168 (5th Cir. 1981), and cases discussed therein.Under section 6512(b)(1), we can find that "the taxpayer has made an overpayment of income tax," and we have the jurisdiction to determine the amount of such overpayment. The term "taxpayer" is defined in section 7701(a)(14) as "any *202 person subject to any internal revenue tax." [19]Essiy is certainly the taxpayer for some purposes. The statutory notices of deficiency in this case were sent to him and only he could petition the Court in regard to those notices and only he could seek a formal declaration by this Court of overpayment of taxes. Stokby v. Commissioner,26 T.C. 912 (1956). As a factual matter, there are overpayment in the Internal Revenue Service's account in the name of Essiy Fink. While we have found as a fact that Essiy did not pay or overpay any taxes during the years before us, that factual conclusion is not determinative of our duty to make a formal declaration of overpayment of taxes. An individual may sue to recover overpayments determined by the Tax Court even though the Tax Court has found as a fact that the particular individual is not the person who made the overpayment. Morse v. United States,supra,494 F. 2d at 879-880. What the Tax Court cannot do is order a refund or decide whether the taxpayer or some other individual is entitled to the refund, the *203 very relief sought in this case. *204 We may only determine the existence and amount of an overpayment, which we have done herein. We have no jurisdiction to order or deny a refund. United States, ex rel. Girard Trust Co. v. Helvering,301 U.S. 540, 542 (1937); Hollie v. Commissioner,supra,73 T.C. at 1204. We take judicial notice of the existence of adverse claims as between Essiy and Paul (and possibly Martin) regarding entitlement to any refund possibly resulting from our decision herein. However, this Court lacks jurisdiction to decide these equitable questions. Commissioner v. Gooch Milling & Elevator Co.,supra,320 U.S. at 418; Morse v. United States,supra,494 F. 2d at 879. Thus, we lack jurisdiction to decide which of several claimants is entitled to a refund, Huntington National Bank v. Commissioner,13 T.C. 760 (1949); to decide who is entitled to the refund when someone other than the person named in the deficiency notice has paid the tax, Snively v. Commissioner,20 T.C. 136 (1953); *205 or to resolve disputes as to a right to a refund that may hinge upon some contingency beyond mere overpayment. Robbins Tire & Rubber Co. v. Commissioner,53 T.C. 275, 279 (1969). The taxpayer must resort to the district court or the claims court for a resolution of such disputes or for an order granting a refund. United States, ex rel. Girard Trust Co. v. Helvering,supra,301 U.S. at 542; Morse v. United States,supra,494 F. 2d at 879. Therefore, we conclude herein only that there is an overpayment of tax in the Internal Revenue Service's account in the name of Essiy Fink for each of the years at issue and leave it to the parties to compute the amount thereof. We express no opinion as to who, is anyone, will ultimately be entitled to any refund that may arise at a later date from our decision herein. Such issues are properly decided only in a subsequent refund suit brought in a court of competent jurisdiction in which respondent will have ample opportunity to avoid any potential double liability for the amounts of the overpayments. Sec. 6512(a)(1); Morse v. United States,supra,494 F. 2d at 879-880. *206 [20] See Stokby v. Commissioner,supra,26 T.C. at 913. The final issue concerns Essiy's liability for an addition to tax under section 6653(a). We have previously concluded herein that he is not taxable on the ovenware business income. Although we have left it to the parties to compute the amount of Essiy's nominal tax liability, if any, which results from the remaining minimal income reported on his returns for the years in issue, it is apparent that the amount of tax previously paid and assessed will greatly exceed any tax liability that could possibly exist for such years. Thus, it is clear that no underpayment within the meaning of sections 6653(a) and (c)(1) exists herein to support the imposition of the negligence addition. [21] Therefore, petitioner is not liable for the section 6653(a) addition. *207 Decisions will be entered under Rule 155.
Footnotes
1. The notices of deficiency and corresponding petitions herein were addressed to and filed by Essiy Fink in his individual capacity. Subsequent to the filing of the petitions, Mr. Fink was declared a legally incapacitated person by the Probate Court of Oakland County, Michigan, and his son, George Fink, was appointed guardian of his person. By order dated August 25, 1981, this Court granted petitioner's motion for substitution of fiduciary, and amended the caption to read as above.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
3. On brief, petitioner argued that the E. Fink Company was in actuality a partnership between Martin and Paul Bruseloff rather than a sole proprietorship of Paul Bruseloff. Due to our resolution of the issues herein, the Company's status as a partnership or sole proprietorship is irrelevant. Accordingly, we express no opinion thereon. See Footnote 5 below.↩
4. Separate petitions were originally filed for docket Nos. 3262-79 and 8003-79. By order dated August 29, 1979, the cases were consolidated for trial, briefing, and opinion along with docket Nos. 3263-79, 8002-79, and 8004-79 involving Paul Bruseloff. The Paul Bruseloff cases having been settled, those cases were severed from the Essiy Fink cases and only the latter cases were tried.↩
5. We use the terms "partnership" and "partner" strictly for descriptive purposes and express no opinion herein as to whether such relationship in fact constituted a partnership for Federal income tax purposes in 1968, 1969, or at any time thereafter. Martin had invested some $25,000 in the ovenware business, and the Court did not believe his testimony that he simply walked away from his investment and left the ovenware business to his brother, Paul. Only Martin testified at the trial; Paul appeared and refused to answer any questions in regard to the ovenware business, asserting his Fifth Amendment↩ rights against self-incrimination. However, we need not and do not make any determination as to Martin's exact role in the ovenware business, but his involvement from 1968 and throughout the years before the Court was substantial in any event.
6. Essiy was legally incapacitated and unable to testify by the time of the trial, but the Court had the transcript of his testimony before the Federal Trade Commission (FTC) in September of 1971 and the transcript of his testimony before a Grand Jury in March of 1975. In the FTC proceeding, Essiy had a motive to try to suggest that he really was the owner of the ovenware business, and in the Grand Jury proceeding (involving tax fraud on the part of Paul Bruseloff), he had a motive to try to dissociate himself from the business. However, his testimony on both occasions was reasonably consistent and supports the conclusion that his association with the ovenware business was minimal at best. We think his testimony before the Grand Jury that he never owned a business in his entire life was accurate. Paul's testimony before the FTC as to Essiy's role was self-serving, highly improbable, and contradicted by the record in this case; hence we accord no weight to Paul's FTC testimony even though it is the only testimony of Paul available to this Court. See footnote 5.↩
7. There were rather substantial deposits in a savings account in Essiy's name. That savings account grew from some $7,900 in 1969 to over $40,000 in 1975. At the time George Fink became his father's guardian, there was $70,000 in that savings account. Other than Martin's testimony that he gave Essiy occasional gifts of money from time to time, there is no evidence in the record as to the source of these deposits. Respondent does not suggest that the funds in this savings account represented any unreported income of the ovenware business or of Essiy individually, and in view of the fact that Martin and perhaps one other person was authorized to sign Essiy's name, the Court does not assume that this money necessarily belonged to Essiy. The only significance the Court attaches to this savings account is the fact that the records of that account clearly show that none of those funds were withdrawn to pay the taxes involved in this case.↩
8. Schedules C covering the ovenware business were also filed with Essiy's tax returns (Forms 1040) for taxable years 1969, 1971, and 1972. Although a Schedule C covering the E. Fink Company was not filed as part of Essiy's original tax return (Form 1040) for taxable year 1975, an amended return (Form 1040X) was subsequently filed for such year that did contain a Schedule C for the Company.↩
9. Although it is clear that Essiy received pension payments in each of the years at issue, no amount was reported as a pension on his 1970 tax return, and the record does not explain such omission. Respondent has not sought an increased deficiency for this omission of income, and we will not consider the matter further. Also the savings account in the name of Essiy Fink showed interest income in amounts greater than the amounts reported on his returns, and again respondent has not sought any increased deficiencies. The Court does not assume the money in that account belonged to Essiy. See footnote 7.↩
10. Mr. Nusholtz originally represented Paul and Essiy before this Court, having filed the original petitions for both taxpayers. Just as respondent had asserted inconsistent and alternative positions in regard to the income of the ovenware business, taxing it to both Paul and Essiy, Mr. Nusholtz too asserted inconsistent and alternative positions to protect his clients. He also filed refund claims for both clients for all tax years. After Essiy became legally incapacitated, his guardian retained new counsel to represent Essiy. The new counsel suggested a possible conflict of interest in regard to Paul Bruseloff and at the counsel's request Mr. Nusholtz withdrew as Essiy's attorney of record. The new counsel then filed an amended petition asserting overpayments of tax by Essiy. ↩
11. Mr. William Menerick was the CPA retained in connection with the 1970 return. Mr. Neal Zalenko was the CPA retained in connection with the 1973 and 1974 tax returns. ↩
12. The 1974 return may have been picked up directly from the CPA's office, instead of from Mr. Nusholtz's office.↩
13. An Application for Extension of Time to File (Forms 2688) was filed for each of the years in issue. An extension was granted until August 15, 1971, September 15, 1974, and September 15, 1975, for taxable years 1970, 1973, and 1974, respectively. Although the returns for 1970 and 1973 were not filed within the respective extension period, respondent has not sought to impose the late filing addition under section 6651(a)(1), and we do not address its applicability herein.↩
14. The statutory notices to Paul covered all years 1969 through 1974.↩
15. The provisions relating to the standard deduction, sections 141, 142, 144, and 145, were repealed by section 101(d)(1) of the Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, 91 Stat. 126, 133 (1977), 1977-1 C.B. 451↩, 457, and were replaced generally by the incorporation of the zero bracket amount into the tax rate tables prescribed by section 1. 16. We note that for taxable year 1974, Essiy claimed itemized deductions in the amount of $4,573, consisting solely of state and local income taxes. It seems apparent that such state and local income taxes also arose from the treatment of the ovenware income as his income, and if so, these payments would not be properly deductible in computing his tax liability. ↩
17. Section 6512(a)(1) provides, in pertinent part, that: (a) Effect of Petition to Tax Court.--If the Secretary . . . has mailed to the taxpayer a notice of deficiency under section 6212(a) (relating to deficiencies of income, estate, gift, and chapter 41, 42, 43, or 44 taxes) and if the taxpayer files a petition with the Tax Court within the time prescribed in section 6213(a), no credit or refund of income tax for the same taxable year, of gift tax for the same calendar year or calendar quarter, of estate tax in respect of the taxable estate of the same decedent, or of tax imposed by chapter 41, 42, 43, or 44 with respect to any act (or failure to act) to which such petition relates, in respect of which the Secretary . . . has determined the deficiency shall be allowed or made and no suit by the taxpayer for the recovery of any part of the tax shall be instituted in any court except-- (1) As to overpayments determined by a decision of the Tax Court which has become final; and * * *↩
18. Section 6402(a) provides, in pertinent part, that: (a) General rule.--In the case of any overpayment, the Secretary . . . within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, . . . refund any balance to such person. Sec. 6402(a) was amended by section 2331(c)(1) of the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, 95 Stat. 357, 861, 1981-2 C.B. 528, 531, effective generally as of October 1, 1981, in order to reconcile section 6402(a) with new section 6402(c), added by section 2331(c)(2) of such Act, 95 Stat. 357, 861, 1981-2 C.B. 528↩, 531, which allows the Secretary to offset the amount of an overpayment by the amount of certain "past-due support" payments. Neither amendment has any bearing on this case. 19. Section 7701(a)(14) provides that: (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof-- * * * (14) Taxpayer.↩--The term "taxpayer" means any person subject to any internal revenue tax.
20. See Morse v. Commissioner,T.C. Memo. 1960-73↩, in which we followed the same procedure as in the present case, and which procedure was approved by the Ninth Circuit when the related refund claims were subsequently appealed from the district court to that circuit.
21. If there were any underpayments, the Court would readily sustain the negligence addition for each year. Essiy's returns were clearly false, misleading and negligent. At the very least, he acquiesced in an attempt to divert income from the ovenware business from the returns of higher bracket individuals to his own otherwise low bracket returns. His acquiescence in the filing of such improper returns has already generated two lawsuits in this Court and unfortunately may well result in further litigation in another forum.↩